889 So.2d 779 (2004)
TRAVELERS INDEMNITY COMPANY, Appellant,
v.
PCR INCORPORATED, et al., Appellees.
No. SC03-630.
Supreme Court of Florida.
December 9, 2004.
*781 Andrew E. Grigsby of Hinshaw and Culbertson, Miami, FL, and Allan B. Taylor of Day, Berry and Howard, LLP, Hartford, CT, for Appellant.
John A. DeVault, III and Michael D. Whalen of Bedell, Dittmar, DeVault, Pillans, and Coxe Professional Association, Jacksonville, FL, for Appellee.
BELL, J.
In Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), we reaffirmed the existence of an intentional-tort exception to the otherwise exclusive nature of the statutory remedy provided by the Workers' Compensation Law. Under the intentional-tort exception, an injured employee can avoid the exclusive-remedy provision of the Workers' Compensation Law and sue his employer in tort if his workplace injury was caused by an intentional tort committed against him by his employer. We held in Turner that an injured employee could satisfy the intentional-tort exception either by demonstrating that his employer actually intended to injure him or by demonstrating that his employer engaged in conduct that was objectively substantially certain to result in injury.[1]
The question presented in this case, by way of two questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit,[2] is whether an employer's liability insurance policy that provides coverage for liability arising from work-related accidental injuries, but excludes from coverage liability arising from injuries intentionally caused by the employer, provides coverage for a tort claim brought under the objectively-substantially-certain prong of the Workers' Compensation Law's intentional-tort exception. We answer this question in the affirmative. *782 Furthermore, we hold that such insurance coverage does not offend, and is not prohibited by, public policy.

I. BACKGROUND
This case arises out of a 1991 explosion at PCR's chemical plant that killed Paul Turner and seriously injured James Creighton, both of whom were employed by PCR as chemical technicians. See Travelers Indem. Co. v. PCR, Inc., 326 F.3d 1190, 1191 (11th Cir.2003); Turner v. PCR, Inc., 754 So.2d 683, 684-86 (Fla.2000) (describing the facts surrounding the explosion). In Turner, we addressed the propriety of the tort suits brought against PCR by the injured employees and held that the trial court erred in granting summary judgment in favor of PCR. 754 So.2d at 691. The issue in this case, on the other hand, is whether Travelers Indemnity Company, the insurer that issued PCR its employer's liability insurance policy (in conjunction with a workers' compensation insurance policy[3]), is obligated under that policy to defend and indemnify PCR in the underlying tort suits. Travelers Indem. Co., 326 F.3d at 1191-92.

A. The Underlying Tort Suits
After the explosion, Turner's wife and Creighton both sued PCR. Turner's wife, as the personal representative of Turner's estate, brought a wrongful-death action, and Creighton brought a personal-injury action. PCR moved for summary judgment on the ground that it was immune from suit under the exclusive-remedy provision of the Workers' Compensation Law.[4] The trial court granted summary judgment in favor of PCR on this ground, and the district court affirmed. Turner v. PCR, Inc., 732 So.2d 342 (Fla. 1st DCA 1998), quashed, 754 So.2d 683 (Fla.2000).
We quashed the district court's decision and held that PCR was not entitled to summary judgment on its exclusive-remedy defense. Turner, 754 So.2d at 684. We began by noting that our case law already recognized that the exclusive-remedy provision of the Workers' Compensation Law did not bar an injured employee from suing his employer in tort if the employee could demonstrate that his injury was the result of an intentional tort committed against him by his employer. Id. at 686-87 (citing Eller v. Shova, 630 So.2d 537 (Fla.1993); Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882 (Fla.1986); and Lawton v. Alpine Engineered Prods., Inc., 498 So.2d 879 (Fla.1986)). We also noted that our case law had recognized two alternative methods for satisfying the intentional-tort exception. An injured employee seeking to avoid the exclusive-remedy provision of the Workers' Compensation Law and sue his employer in tort could do so, of course, by demonstrating that his employer "exhibited a deliberate intent to injure" him. Turner, 754 So.2d at 687 (quoting Fisher, 498 So.2d at 883) (alteration omitted). Alternatively, an injured employee could satisfy the intentional-tort exception by demonstrating that his employer "engaged in conduct which [was] substantially certain to result in injury or death." Id. at 687 (quoting Fisher, 498 So.2d at 883) (alteration omitted).
In Turner, however, we went one step further. We held that the latter method of satisfying the intentional-tort exception, *783 the substantial-certainty method, calls for an objective inquiry: the relevant question is not whether the employer actually knew that its conduct was substantially certain to result in injury or death but, rather, whether the employer should have known that its conduct was substantially certain to result in injury or death. 754 So.2d at 688. Accordingly, we held that under the substantial-certainty method of satisfying the intentional-tort exception, "the employer's actual intent is not controlling." Id. Rather, this method requires a court to look to the totality of the circumstances "to determine whether a reasonable person would understand that the employer's conduct was substantially certain to result in injury or death to the employee." Id. (internal quotation marks omitted).[5] Applying *784 this standard, we held that PCR was not entitled to summary judgment because genuine issues of material fact existed as to whether its conduct had been objectively substantially certain to cause injury or death. Id. at 691.[6]

B. The Employer's Liability Insurance Policy
At the time of the explosion, PCR was insured by Travelers Indemnity Company (Travelers) under a "Workers Compensation and Employers Liability Policy." As its name suggests, this was a dual-coverage policy. Part One, entitled "Workers Compensation Insurance," provided that Travelers would "pay promptly when due the benefits required of [PCR] by the workers compensation law." Part Two, entitled "Employers Liability Insurance," provided that Travelers would "pay all sums [PCR] legally must pay as damages because of bodily injury to [PCR's] employees, provided the bodily injury is covered by this Employers Liability Insurance." Part Two's coverage applied only to claims of "bodily injury by accident ... aris[ing] out of and in the course of the injured employee's employment by [PCR]." Additionally, Part Two enumerated several exclusions from coverage, one of which was that "[t]his insurance does not cover ... bodily injury intentionally caused or aggravated by [PCR]."[7]
After our decision in Turner, Travelers brought a declaratory-judgment action in the federal district court to determine whether it was obligated under Part Two of the Workers Compensation and Employers *785 Liability Policy to defend or indemnify PCR against the claims brought by PCR's injured employees in the underlying tort suits. The district court granted summary judgment in favor of PCR, holding that the claims in the underlying tort suits were covered by the policy because the injury-intentionally-caused exclusion applied only if the insured specifically intended to cause injury. See Travelers Indem. Co., 326 F.3d at 1192. On appeal, the federal court of appeals was unsure how Florida law would interpret the policy. The court recognized that two of Florida's district courts of appeal had interpreted identical exclusionary clauses to apply only when the insured acted with the specific intent to cause injury. Id. at 1193-94 (citing Cloud v. Shelby Mut. Ins. Co., 248 So.2d 217 (Fla. 3d DCA 1971), and Phoenix Ins. Co. v. Helton, 298 So.2d 177 (Fla. 1st DCA 1974)). The court, however, was unsure whether our decision in Turner affected this line of cases. The court noted that if Cloud and Helton controlled, "Travelers could remain liable for what might be interpreted [under Turner] as PCR's `intentional' torts if the torts were committed without specific intent to cause injury to the employees." Id. at 1194. Because "[t]he law of Florida on point seem[ed] debatable," the court certified the following questions:
1. Does Florida insurance law require a reading of specific intent into an insurance clause excepting from liability coverage "[b]odily injury intentionally caused or aggravated" by the insured?
2. Is PCR in this case entitled to liability coverage based on the language of this policy agreement, read in the light of Florida's law of interpreting insurance policies?
Id.

II. DISCUSSION
This case raises two separate issues. The first issue is one of contract interpretation. Does the insurance policy, properly interpreted, extend coverage to the claims brought against PCR in the underlying tort suits. Specifically, does an employer's liability insurance policy, which provides coverage for "bodily injury by accident" and excludes from coverage "injur[ies] intentionally caused" by the insured, extend coverage to a claim brought under Turner's objectively-substantially-certain standard, where the injured employee does not allege that the employer actually intended to cause injury. We answer this question in the affirmative. The second issue is one of public policy. Does public policy prohibit an employer from insuring against the risk of liability arising under Turner's objectively-substantially-certain standard. We answer this question in the negative. We will address each of these issues below.

A. Interpreting the Policy
We must begin by looking to the language of the policy. If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written. See Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 165 (Fla.2003); Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 735 (Fla.2002). Policy language is considered to be ambiguous, however, if the language "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage." Swire Pac. Holdings, 845 So.2d at 165 (quoting Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000) (brackets omitted)). When language in an insurance policy is ambiguous, a court will resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy's language that *786 provides coverage as opposed to the reasonable interpretation that would limit coverage. Swire Pac. Holdings, 845 So.2d at 165; Auto-Owners Ins. Co., 756 So.2d at 34.

1. The Coverage Clause
The parties contest the interpretation of two separate clauses of the policy: the coverage clause and the injury-intentionally-caused exclusionary clause. We begin by analyzing the coverage clause. The policy's coverage clause provides that the policy, under which Travelers agrees to "pay all sums [PCR] legally must pay as damages because of bodily injury to [PCR's] employees," applies only to "bodily injury by accident ... aris[ing] out of and in the course of the injured employee's employment by [PCR]." The question is whether a claim brought against PCR by an injured employee under Turner's objectively-substantially-certain standard constitutes a claim for "bodily injury by accident." Travelers argues that such a claim, brought as it is under the intentional-tort exception to the exclusive-remedy provision of the Workers' Compensation Law, even if brought under the objectively-substantially-certain prong of the intentional-tort exception rather than the deliberate-intent prong, cannot be considered to be a claim for bodily injury by accident.
Travelers finds support for this argument in the reasoning we employed in Turner. We noted in Turner that "workers' compensation is the exclusive remedy for `accidental injury or death arising out of work performed in the course and the scope of employment.'" 754 So.2d at 686 (quoting § 440.09(1), Fla. Stat. (1997)) (emphasis added). Even though the exclusive-remedy provision did not provide explicitly for an intentional-tort exception, we were able to conclude that such an exception was implicit in the bargain struck by the Workers' Compensation Law. We took this reasoning a step further in determining that an injured employee could satisfy the intentional-tort exception not only by demonstrating that his employer actually intended to injure him, but also by demonstrating that his injury was caused by employer conduct that was objectively substantially certain to cause injury. Noting that the statute defined "accident" as "only an unexpected or unusual event or result," we concluded that "under the plain language of the statute, it would appear logical to conclude that if a circumstance is substantially certain to produce injury or death, it cannot reasonably be said that the result is `unexpected' or `unusual.'" Turner, 754 So.2d at 689 (emphasis omitted). Such a result, therefore, could not be considered accidental and was not subject to the exclusive-remedy provision of the Workers' Compensation Law.
Simply put, Travelers' argument is this: (1) the employer's liability policy covers only claims for bodily injury by accident; (2) if these underlying claims were claims for bodily injury by accident, they would be barred by the exclusive-remedy provision of the Workers' Compensation Law  the only reason such claims were allowed to proceed under Turner was because we concluded that they could not be considered to be claims for bodily injury by accident; therefore, (3) these underlying claims, by virtue of the fact that they are not barred by the exclusive-remedy provision, are not claims for "bodily injury by accident" and are not covered by the policy.
This argument certainly presents a reasonable interpretation of the policy's coverage clause, and it is, essentially, the conclusion adopted by the two dissenting opinions. But it is not an interpretation that flows necessarily from the clause's plain language; nor is it the only reasonable *787 interpretation of the clause.[8] The policy does not define the term "accident," and Travelers' argument relies on the importation of our reasoning in Turner and the definition of "accident" employed there. The flaw in this argument, however, is that in Turner we employed principles of tort law to interpret the Workers' Compensation Law. Here, on the other hand, we are called upon to interpret an insurance policy. In Prudential Property & Casualty Insurance Co. v. Swindal, 622 So.2d 467 (Fla.1993), in the context of interpreting an intentional-injury exclusion in a homeowners' insurance policy, we held:
Florida has long followed the general rule that tort law principles do not control judicial construction of insurance contracts. Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties. Ambiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy. Thus, intentional act exclusions are limited to the express terms of the policies and do not exclude coverage for injuries more broadly deemed under tort law principles to be consequences flowing from the insured's intentional acts.
622 So.2d at 470 (citations omitted). The same principle applies here.[9] We must interpret the phrase "bodily injury by accident," as used in this insurance policy, "in accordance with the plain language of the polic[y] as bargained for by the parties." Id. If the policy's language is not plain  if it "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage," Swire Pac. Holdings, 845 So.2d at 165 (quoting *788 Auto-Owners Ins., 756 So.2d at 34) (brackets omitted)  we must resolve the ambiguity and interpret the language "liberally in favor of the insured and strictly against the insurer who prepared the policy." Swindal, 622 So.2d at 470. In other words, the coverage clause must be interpreted in accordance with our general principles of insurance policy interpretation. We cannot limit the scope of the term "accident" (when not defined in the policy) narrowly to cover only those circumstances deemed "accidental" under principles of tort law or workers' compensation law.[10]
Our decision in Turner rested squarely on tort law principles. In adopting an objective substantial-certainty test, we relied on Spivey v. Battaglia, 258 So.2d 815 (Fla.1972), which itself relied on the Restatement of Torts, for the proposition that "[w]here a reasonable man would believe that a particular result was substantially certain to follow, he will be held in the eyes of the law as though he had intended it." Id. at 817 (first emphasis added). Based on this tort law principle, we held that an injury would not be considered "accidental," and an injured employee therefore could satisfy the intentional-tort exception, if his injury resulted from employer conduct that was objectively substantially certain to result in injury. Importantly, under this standard the employer need not have known that its conduct was substantially certain to cause injury; the fact that it should have known of the substantial certainty of injury would be sufficient to negate the "unexpectedness" or "unusualness" of any resulting injury, regardless of whether the injury truly was unexpected by the employer.[11] Nothing in the insurance policy, *789 however, suggests that the "by accident" coverage clause should be construed in this narrow sense.[12]
In support of its argument that we should interpret the "by accident" coverage clause in accordance with our reasoning in Turner, Travelers points to our decision in State Farm Fire & Casualty Co. v. CTC Development Corp., 720 So.2d 1072 (Fla.1998). In CTC Development, we had to interpret the coverage clause of a building contractor's business liability insurance policy. The policy covered "[t]hose sums that the insured becomes legally obligated to pay as damages because of ... property damage ... caused by an occurrence." Id. at 1073 (emphasis omitted). The policy defined "an occurrence" as "[a]n accident." Id. The case arose after CTC Development (CTC), the insured building contractor, was sued by the neighbors of the clients for whom it was building a house. The neighbors sued CTC for building the house in violation of restrictive covenants that required the house to be built at a fifteen-foot setback. CTC admitted that it knowingly built the house beyond the fifteen-foot setback but asserted that it did so only on the mistaken belief that its variance request had been approved.
The question in CTC Development was whether the damages resulting from CTC's setback violation were caused by "an accident." If so, they were covered by the policy; if not, they were not. State Farm, the insurer, argued that the case was controlled by our earlier decision in Hardware Mutual Casualty Co. v. Gerrits, 65 So.2d 69 (Fla.1953), a case involving remarkably similar facts. We held in Gerrits that the construction of a home over the property line was not "an accident" within the meaning of the policy (which left the term undefined) because the builder had "deliberately and designedly (although erroneously) located the building on a part of the adjoining property and he intended to build it at that particular site." CTC Development, 720 So.2d at 1074 (quoting Gerrits, 65 So.2d at 71). Gerrits relied on the principle that "[a]n effect which is the natural and probable consequence of an act or course of action is not an accident." Id. (quoting Gerrits, 65 *790 So.2d at 70) (emphasis omitted). Gerrits reasoned that it did not matter whether the builder intended or expected the result because the result was the natural and probable consequence of its deliberate act. Id.
In CTC Development, we rejected Gerrits' reasoning. Gerrits erred, we held, in importing the tort law principle of "natural and probable consequences" into the context of insurance policy interpretation. Id. ("Florida law has long followed the general rule that tort law principles do not control judicial construction of insurance contracts.") (quoting Swindal, 622 So.2d at 470). Interpreting the term "accident," which the policy left undefined, in accordance with the principles of insurance policy interpretation rather than tort law, we held that the policy in CTC Development covered "not only `accidental events,' [i.e., accidental or unwilled acts,] but also damages or injuries that are neither expected nor intended from the viewpoint of the insured." Id. at 1072. This, we held, was the proper definition of "the term `accident' in a[ny] liability policy [in which the term] is not defined." Id. at 1076.
Travelers argues that we should apply the CTC Development definition of "accident" to the "by accident" coverage clause at issue here. If we were to apply this definition, Travelers argues, the policy could not be interpreted to extend coverage to the injured employees' Turner claims. Travelers' argument, however, is unpersuasive. Assuming that we should use the CTC Development definition in interpreting this policy, the result still would not support Travelers' argument that a claim brought under Turner's objectively-substantially-certain standard, by definition and as a matter of law, cannot be considered a claim for "bodily injury by accident" and, therefore, necessarily falls outside the scope of the policy's coverage clause.[13] The flaw in this argument is that the CTC Development definition evaluated intent or expectation from the insured's subjective point of view. 720 So.2d at 1072. CTC Development extended the scope of the term "accident" to include not only damages resulting from unintentional or accidental acts, but also to include damages resulting from intentional or volitional acts as long as the insured actor neither intended nor expected the resulting damages. To satisfy the *791 objectively-substantially-certain standard of Turner, on the other hand, an injured employee need not prove that his or her employer actually expected that its conduct would result in injury. Rather, under Turner, an injured employee only needs to demonstrate that his or her employer should have expected that injury would result. Turner, 754 So.2d at 688-89. At the least, therefore, the policy's "by accident" coverage clause, if interpreted in accordance with our CTC Development definition, would provide coverage for a Turner claim unless the injured employee demonstrated that the insured employer actually expected (with expectation measured to the degree of substantial certainty) that its conduct would result in injury. Interpreting the coverage clause in this way probably would preclude coverage of a claim brought under the newly enacted, virtual-certainty standard, but it does not, as a matter of law, preclude coverage under the more liberal, objectively-substantially-certain standard articulated in Turner.[14]

2. The Exclusionary Clause
The next point of contention between the parties involves the proper interpretation of the exclusionary clause. The parties' respective arguments on this issue essentially are identical to their arguments on the coverage-clause issue. Travelers argues that any claim brought under the intentional-tort exception, by definition, must be excluded under an injury-intentionally-caused exclusionary clause. More precisely, Travelers argues that Turner rested on the notion that intent to injure would be imputed by law to conduct that was objectively substantially certain to cause injury; otherwise, Travelers contends, such conduct would not satisfy the intentional-tort exception. See Turner, 754 So.2d at 691 ("This [objectively substantially certain] standard imputes intent upon employers in circumstances where injury or death is objectively substantially certain to occur.") (internal quote marks omitted). As it did in response to Travelers' coverage-clause arguments, PCR contends that Travelers again seeks improperly to interpret an insurance policy in accordance with tort law principles. Again, we conclude that PCR is correct. In order for this particular exclusionary clause to apply, the insured must have acted with the specific intent to cause injury.
We begin by noting, as we did above, that "tort law principles do not control judicial construction of insurance contracts." Swindal, 622 So.2d at 470. In holding that this exclusionary clause applied only if the insured acted with the specific intent to injure, the federal district court relied on two decisions of Florida's district courts of appeal. The first case was Cloud v. Shelby Mutual Insurance Co., 248 So.2d 217 (Fla. 3d DCA 1971), in which the Third District Court of Appeal interpreted an injury-intentionally-caused exclusionary clause in an automobile liability insurance policy. Cloud, the insured, "impatiently sought to push out of his way a car blocking him in a driveway. His bumper overrode the bumper of the car ahead, and seriously injured ... a passenger in the pushed car." Id. at 217-18. Cloud's insurer argued that it was not obligated under the insurance policy to defend Cloud in the suit brought against Cloud by the injured passenger, arguing that the claim was excluded from coverage under the injury-intentionally-caused exclusionary clause (excluding from coverage "bodily injury or property damage caused intentionally by or at the direction of the insured"). Id. at 218. The parties stipulated *792 that Cloud "intentionally push[ed]" the car but did not "intentionally cause" the injuries to the car's passenger. Id. The district court concluded that under such a clause "coverage is not excluded as a matter of law where there was an `intentional act' but not an `intentionally caused' injury." Id. (citing W.E. Merritt III, Annotation, Liability Insurance: Specific Exclusion of Liability for Injury Intentionally Caused by Insured, 2 A.L.R.3d 1238 (1965)). The court adopted the rule that
injury or damage is "caused intentionally" within the meaning of an "intentional injury exclusion clause" if the insured has acted with the specific intent to cause harm to a third party, with the result that the insurer will not be relieved of its obligations under a liability policy containing such an exclusion unless the insured has acted with such specific intent.
Id. (quoting 44 Am.Jur.2d, Insurance, § 1411, at 259). The other case relied on by the federal district court was Phoenix Insurance Co. v. Helton, 298 So.2d 177 (Fla. 1st DCA 1974), in which the First District Court of Appeal followed Cloud. 298 So.2d at 180-82.
Travelers does not dispute the authority of Cloud and Helton. Rather, Travelers argues that a Turner claim is more appropriately analyzed under our decision in Landis v. Allstate Insurance Co., 546 So.2d 1051 (Fla.1989). Relying on Landis, Travelers argues that the law should impute intent to injure in cases where the insured's conduct was substantially certain to result in injury. Landis, however, does not support this argument.
In Landis, an insured who was being sued for sexually molesting several children sought coverage under his homeowner's insurance policy. The insured argued that the policy's injury-intentionally-caused exclusionary clause did not apply because he had not "specifically intended" to cause harm. Id. at 1053. We rejected this argument because "[t]o state that a child molester intends anything but harm ... to the child defies logic." Id. "[S]ome form of harm inheres in and inevitably flows from the proscribed behavior." Id. (quoting Zordan v. Page, 500 So.2d 608, 614 (Fla. 2d DCA 1987) (Frank, J., dissenting)).
We went on to state that "specific intent to commit harm is not required by the intentional acts exclusion. Rather, all intentional acts are properly excluded by the express language of the homeowners policy." Id. This statement caused confusion, and in Swindal we made clear that

Landis in no way changed the law set forth [in Cloud and Helton]. Landis held that an intentional injury exclusion clause excluded coverage for injuries suffered by children who were sexually molested while under the care of the insureds. This Court unanimously rejected the insured's argument that coverage should not be excluded because the insured intended no harm, holding instead that harm always results from child sexual abuse such that any intent to molest necessarily carries with it an intent to harm.... Our decision in Landis did not suggest that courts apply tort law causation principles of "reasonably foreseeable" or "natural and probable consequences" in construing the intentional injury clause in insurance contracts. Rather, we merely found that an intent to injure is inherent in the act of sexually abusing a child.
622 So.2d at 471-72 (citations omitted) (emphasis added). We reiterated that
Florida law has long followed the general rule that tort law principles do not control judicial construction of insurance contracts.... Thus, intentional act exclusions *793 are limited to the express terms of the policies and do not exclude coverage for injuries more broadly deemed under tort law principles to be consequences flowing from the insured's intentional acts.
Id. at 470.
We reject Travelers' argument that conduct satisfying Turner's objectively-substantially-certain standard can and should be equated, for purposes of imputing intent to injure, with the conduct at issue in Landis.[15] Our holding in Landis rested on the uncontroversial fact that injury inheres in and inevitably flows from an act of sexual molestation; the act and the harm cannot be separated. (Even more important, particularly with respect to the issue of public policy, which we discuss below, is the lack of the element of fortuity between the act and the resulting harm. The commission of the act necessarily causes the harm. There is no element of chance involved: one could not commit the act without causing the harm.) The same cannot be said of conduct giving rise to a Turner claim. Indeed, in Turner we emphasized that the substantial-certainty standard should not be interpreted to require a showing of virtual certainty. 754 So.2d at 687 n. 4.[16] We noted that the substantial-certainty standard "require[d] a showing greater than `gross negligence,'" but we suggested a similarity between a culpable-negligence standard and the substantial-certainty standard. 754 So.2d at 687-88 n. 4. (noting that one was "not unlike" the other).[17] It is true, as Travelers notes, that the substantial-certainty standard of Turner requires a greater level of foreseeability than the natural and probable consequences standard at issue in Cloud and Helton. But the difference here is quantitative; on the other hand, there is a qualitative difference between these foreseeability standards and the inherency standard of Landis.

B. Public Policy
The next issue we must address is whether public policy prohibits an employer *794 from insuring against the risk of liability arising under Turner's objectively-substantially-certain standard. In Ranger Insurance Co. v. Bal Harbour Club, Inc., 549 So.2d 1005 (Fla.1989), we articulated a two-factor test for determining "whether a particular policy of civil liability insurance is opposed to public policy." Id. at 1007. The first factor looks to whether the type of conduct for which liability is imposed would be "encouraged" if one could insure against the risk of liability arising from such conduct. Id. In other words, we ask "whether the existence of insurance will directly stimulate commission of the wrongful act." Id. The second factor looks to whether the purpose served by the imposition of liability for certain conduct is "to deter wrongdoers or compensate victims." Id.
Applying this two-factor test, we conclude that public policy does not prohibit an employer from insuring against the risk of liability arising under Turner's objectively-substantially-certain standard. With respect to the first factor, it is instructive to compare the type of conduct at issue in Bal Harbour with the type of conduct that will subject an employer to tort liability under Turner. The question in Bal Harbour was whether public policy prohibited insurance coverage for liability arising from intentional religious discrimination. We rejected "the supposition that making intentional religious discrimination insurable w[ould] not encourage such discrimination." 549 So.2d at 1008. The analysis would apply equally to a claim brought under the deliberate-intent prong of the intentional-tort exception. Both types of claims squarely implicate the rule that "one should not be able to insure against one's own intentional misconduct." Id. at 1007 (citing 12 John Alan Appleman & Jean Appleman, Insurance Law and Practice, § 7031 (1981)). Where liability is not predicated on intent, however, the rule is not implicated. See, e.g., Bal Harbour Club, 549 So.2d at 1006 (distinguishing between claims of intentional [or disparate treatment] discrimination and claims of unintentional [or disparate impact] discrimination and concluding that the latter "is clearly a legitimate business risk and as such is insurable"); see also Harasyn v. Normandy Metals, Inc., 49 Ohio St.3d 173, 551 N.E.2d 962, 964-65 (1990) (distinguishing between claims brought under the direct-intent prong of Ohio's intentional-tort exception and claims brought under the substantial-certainty prong and concluding that in the case of substantial-certainty torts "the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed").
The second Bal Harbour Club factor also supports the conclusion that public policy does not prohibit an employer from insuring against the risk of liability arising under Turner's objectively-substantially-certain standard. Again, comparing the conduct at issue in Bal Harbour Club and the conduct at issue here is instructive. In Bal Harbour Club, we looked to Florida's "long-standing policy of opposing religious discrimination" and concluded that "the primary purpose served by the imposition of liability for intentional acts of wrongful discrimination is to deter wrongful discrimination." Id. at 1008. In this respect, employer conduct that was objectively substantially certain to cause injury, even though the employer neither intended nor actually expected that its conduct would cause injury, is distinguishable from an act of intentional discrimination. See Bal Harbour Club, 549 So.2d at 1006 (distinguishing between claims of intentional discrimination and claims of unintentional discrimination). Bal Harbour Club recognized that most tort liability, even liability for intentional discrimination, will serve *795 both deterrent and compensatory goals. 549 So.2d at 1008. The unique nature of intentional discrimination suggested that the primary purpose of imposing liability for such conduct was to serve the goal of deterrence. We do not believe the same can be said for conduct subjecting an employer to liability under Turner's objectively-substantially-certain standard.
Travelers points to our statement in Turner where we justified the adoption of an objective substantial-certainty standard on the ground that failure to adopt such a standard "would virtually encourage a practice of `willful blindness' on the part of employers who could ignore conditions that under an objective test would be found to be dangerous." 754 So.2d at 691. Travelers argues that this statement supports the contention that the primary purpose of imposing tort liability under Turner is to deter employers from engaging in conduct that is objectively substantially certain to cause injury. But this argument also would suggest that liability imposed for negligent conduct is primarily directed at the goal of deterrence. The truth is that the goals of deterrence and compensation generally are so interdependent that it is difficult to separate the two and call one the primary goal. Semantics would suggest that liability for compensatory damages primarily is intended to advance the goal of compensation. But an equally basic aim of imposing liability for compensatory damages resulting from negligent conduct is to deter such conduct, i.e., to encourage actors to take efficient precautions and care to avoid causing damages. Our statement in Turner is better understood as a reflection of our understanding of the nature of the bargain struck by the Workers' Compensation Law, and what types of conduct were not contemplated by the Legislature as falling under the provisions of that bargain. See Turner, 754 So.2d at 691 ("This holding [adopting an objective substantial-certainty test] is also consistent with legislative policy recognizing the liability of managerial or policy-making coemployees for conduct constituting reckless indifference to the safety of other employees."). Turner did not upset the fundamentals of Florida insurance law, nor did it create a new one-size-fits-all definition of "accident." Turner simply held that the Workers' Compensation Law did not preclude (because, we concluded, the give-and-take between employers and employees that the Legislature crafted in the Workers' Compensation Law was not intended to preclude) an injured employee from suing his employer in tort if his injuries were caused by employer conduct that the employer should have known was substantially certain to cause injury.

III. CONCLUSION
We answer the two certified questions in the affirmative and hold that Part Two of the Workers Compensation and Employers Liability Policy issued to PCR by Travelers, which covers claims for "bodily injury by accident" and excludes from coverage claims of "bodily injury intentionally caused ... by [PCR]," extends coverage to a claim brought against PCR under the objectively-substantially-certain standard articulated in Turner.[18] A claim brought under Turner's objectively-substantially-certain standard does not on its own or as a matter of law fall outside the scope of this particular employer's liability insurance policy. Whether a claim brought under the newly enacted virtual-certainty *796 standard would fall outside such a policy is a different question, which we do not answer here. We also hold that public policy does not prohibit an employer from insuring against the risk of liability arising under Turner's objectively-substantially-certain standard.
It is so ordered.
PARIENTE, C.J., and ANSTEAD and LEWIS, JJ., concur.
WELLS, J., dissents with an opinion, in which QUINCE and CANTERO, JJ., concur.
QUINCE, J., dissents with an opinion, in which WELLS and CANTERO, JJ., concur.
WELLS, J., dissenting.
I would restate the question certified by the Eleventh Circuit to be:[19]
Does the correct construction under Florida law of "PART TWO  EMPLOYERS LIABILITY INSURANCE" of the Travelers Insurance policy provide coverage to PCR for the claims brought by the two PCR employees for death and injury resulting from the explosion at the PCR chemical plant in 1991?
My answer to this rephrased question is "no."
I reach this conclusion by beginning the analysis at the same point we began our analysis of a similar policy in Humana Worker's Compensation Services v. Home Emergency Services, Inc., 842 So.2d 778 (Fla.2003). In Humana, we stated.
To determine whether there is coverage, as our threshold examination we must construe Section A of Part Two, the provision that explains "How This Insurance Applies." In this examination we are bound by rules of construction which we have long applied, the foremost of which is that insurance contracts must be construed in accordance with their plain language. See Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000); Prudential Property & Cas. Ins. Co. v. Swindal, 622 So.2d 467, 470 (Fla.1993). Applying this rule to this coverage provision, the issue is then whether this claim for spoliation of evidence is a claim for "bodily injury by accident."
842 So.2d at 781. The language of the Travelers policy is identical to the policy in Humana in stating:
PART TWO  EMPLOYERS LIABILITY INSURANCE.
A. How This Insurance Applies
This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.
In accord with the framework we laid out for analysis of this policy, the threshold issue here is whether these claims are "claims for bodily injury by accident."
On this threshold issue, I agree with Justice Quince. While I respect the precedent of the line of Florida cases cited in the majority opinion which have stated that tort law principles do not control the construction of the provisions of insurance contracts, majority op. at 787, citing to Prudential Property & Casualty Insurance Co. v. Swindal, 622 So.2d 467 (Fla.1993), I conclude that that precedent is not applicable to this case. Rather, in this case, the principles which must be applied in construing the provisions of the Travelers' *797 insurance contract are the principles set forth in our decision in Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000). This is because we have specifically decided whether the death and injuries to these employees were caused by accident, and we decided that they were not.
I conclude that it is simply an unreasonable, irreconcilable inconsistency for this Court to hold in Turner that the employee's death and injuries which were the basis of the claims were not subject to workers' compensation immunity because the death was not caused by accident and then here to hold that the employer's liability coverage applies because the same employee's death and injuries were caused by accident. Not only were the employees the same, the explosion was the same, and the conduct of PCR was the same. A plain language construction of the insurance policy cannot avoid what we said in Turner about whether death and injuries are caused by accident:
We also note, as did Justice Adkins' dissent in [Fisher v. Shenandoah General Construction Co., 498 So.2d 882 (Fla.1986),] that section 440.09(1), Florida Statutes (1991) provides compensation for injury by accident: "Compensation shall be payable under this chapter in respect of disability or death of an employee if the disability or death results from an injury arising out of and in the course of employment." Injury is defined in section 440.02(17), Florida Statutes (1991) as "personal injury or death by accident arising out of and in the course of employment." Accident is further defined in section 440.02(1), Florida Statutes (1991) as "only an unexpected or unusual event or result, happening suddenly." Conversely, therefore, under the plain language of the statute, it would appear logical to conclude that if a circumstance is substantially certain to produce injury or death, it cannot reasonably be said that the result is "unexpected" or "unusual," and thus such an event should not be covered under workers' compensation immunity.
754 So.2d at 689.
Even as esoteric and nuanced as insurance policy construction law has become in our case law, as set out in detail by the majority, it is my view that the law has to conform to the common sense and logic of the particular case in which it is applied. I find it incompatible with common sense and logic to hold that the same deaths and injuries are not caused by "an accident" for purposes of the employer's liability for workers' compensation immunity from common law liability but are caused by accident for purposes of the same employer having common law liability which is covered by an employer's liability insurance policy applying only to injuries caused by accident.
Moreover, even if I could accept the foregoing inconsistency, I could not then explain how the policy exclusion which expressly states that "[t]his insurance does not cover bodily injury intentionally caused," is inapplicable. Again, in Turner, the majority opinion held:
In summary, we find that our prior case law recognizes, and we reaffirm, the existence of an intentional tort exception to an employer's immunity. That intentional tort exception includes an objective standard to measure whether the employed engaged in conduct which was substantially certain to result in injury. This standard imputes intent upon employers in circumstances where injury or death is objectively "substantially certain" to occur.
754 So.2d at 691. What I understand this to mean is that we use both subjective and objective standards upon which the conduct of an employer is to be judged but *798 both standards are judging whether there was an intent to injure.
I conclude that the Turner intent being an intent to injure distinguishes this situation from the Swindal decision and from Gulf Life Insurance Co. v. Nash, 97 So.2d 4 (Fla.1957), and Cloud v. Shelby Mutual Insurance Co., 248 So.2d 217 (Fla. 3d DCA 1971). In Swindal, Nash, and Cloud, there was determined not to be an intent to injure. Rather, there was intent in Swindal and Nash to create fear and the injury was the result but not the intended result. In Cloud, the intent was to push the car, and the injury was the result of the intent to push the car.
The present case is much closer and is analogous to Landis v. Allstate Insurance co., 546 So.2d 1051 (Fla.1989). In Landis, we recognized that the intent to molest a child was an intent to injure the child. As the majority opinion notes, the reason we so held was because "harm inheres in and inevitably flows from the proscribed behavior." Majority op. at 792. I believe this is what we found to be the standard for intent in our Turner decision. If this is not a correct reading of Turner, then Turner erringly changed what is necessary to be proven to avoid workers' compensation immunity. In Turner, we were applying an exception to the immunity based upon an intent to cause injury.
In sum, I believe the analyses of our Turner case have to control this case. Under those principles, the employer's liability insurance of Part Two of the Travelers' policy does not apply. Even if the insurance did apply to theses claims, the claims would be excluded by the "intentionally caused" exclusion.
QUINCE and CANTERO, JJ., concur.
QUINCE, J., dissenting.
I dissent from the majority's determination that PCR's liability insurance policy provided coverage for this incident. It is clear that the explosion at the PCR's chemical plant was not an "accident."
The policy in the instant case, titled "Workers Compensation and Employers Liability Policy," contains two parts. Part Two of this policy details the Employers Liability Insurance. It provides in relevant part:
PART TWO-EMPLOYERS LIABILITY INSURANCE
A. How This Insurance Applies
This employer's liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death....
B. We Will Pay
We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.
The damages we will pay, where recovery is permitted by law, include damages:
1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;
2. for care and loss of services; and
3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee; provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and
4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

*799 C. Exclusions
This insurance does not cover: ...
5. bodily injury intentionally caused or aggravated by you.
Part Two of this policy provided coverage to PCR for bodily injury by accident or disease. Since this case does not involve bodily injury by disease, we must focus on the definition of bodily injury by accident in order to determine whether PCR was covered by the policy for the incident that killed Paul Turner and injured James Creighton. Unfortunately, the term "accident" is not defined in the policy. Therefore, we must look outside the policy for its definition.
The term "accident" is defined as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." Black's Law Dictionary 15 (7th ed.1999); see also Koikos v. Travelers Ins. Co., 849 So.2d 263, 267 (Fla.2003) ("We hold that where the term `accident' in a liability policy is not defined, the term, being susceptible to varying interpretations, encompasses not only `accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured."); Duff Hotel Co. v. Ficara, 150 Fla. 442, 7 So.2d 790, 792 (1942) ("`Accident' is not a technical legal term with a well bounded meaning. In Workmen's Compensation it has been applied to that which happens by chance or casually, that which proceeds from an unknown cause or the unusual which sometimes results from known causes."); Roberson v. United Servs. Auto. Ass'n, 330 So.2d 745, 746 (Fla. 1st DCA 1976) ("Customarily, an accident is defined as an unexpected or unusual event; it is something which happens by chance and without design; it is an event from an unknown cause."); Braley v. American Home Assurance Co., 354 So.2d 904, 905 (Fla. 2d DCA 1978) ("The courts have repeatedly held that the term `accident,' as all other terms in an insurance policy not defined in the policy, should be given its everyday `man-on-the-street' meaning.... We find, then, that the everyday man-on-the-street definition of `accident' includes an unexpected result."). Since the explosion in the instant case was foreseeable and should have been anticipated, it was not an accident.
When this case was first before this Court, Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), we reaffirmed our prior decisions holding that Florida Worker's Compensation Law, codified in chapter 440, Florida Statutes (1997), does not provide immunity to employers who commit an intentional tort against their employees. See 754 So.2d at 687. Guided by Fisher v. Shenandoah General Construction Co., 498 So.2d 882 (Fla.1986), Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), and Eller v. Shova, 630 So.2d 537 (Fla.1993), we stated that "in order to prove an intentional tort, the employer must be shown to have either `exhibite[d] a deliberate intent to injure or engage[d] in conduct which is substantially certain to result in injury or death.'" 754 So.2d at 683 (alterations in original) (quoting Fisher, 498 So.2d at 883). Acknowledging that PCR did not deliberately intend to injure Creighton and Turner, we focused on the second part of this disjunctive test, i.e., whether PCR's conduct was substantially certain to result in injury or death. Id. at 688.
We adopted an objective standard for determining substantial certainty: "whether a reasonable person would understand that the employer's conduct was `substantially certain' to result in injury or death to the employee." Id. at 688-89. We stated that "if a circumstance is substantially certain to produce injury or death, it cannot *800 reasonably be said that the result is `unexpected' or `unusual,' and thus such an event would not be covered under workers' compensation immunity." Id. at 689. Applying that objective test to the facts at hand, we held that there was sufficient proof to preclude the entry of a summary judgment for PCR. Id. In so holding, we found that there was an abundance of evidence leading to the conclusion that PCR's conduct was substantially certain to result in injury to its employees:
As in Connelly, there is evidence here that PCR knew of the highly explosive nature of TFE and the reactants, yet failed to disclose this to its employees. Further, as in Connelly, there is evidence here that by putting the concern for profits first, PCR ignored the safety risks and attempted to meet Dupont's demands by using an unsuited existing reaction facility that lacked the proper safety instruments. In fact, this case is arguably more egregious than Connelly and Cunningham in that PCR knew of prior similar explosions with the same and similar chemicals involved in the explosion at issue here, yet chose to ignore them.... [T]here are allegations in this case that PCR did not disclose the extent of the danger created by TFE of which ICI had informed PCR in writing.
Id. at 691.
At the time of the explosion on November 22, 1991, PCR was combining the chemicals "tetrafluoroethylene (TFE) with hexafluoropropene (HFP), in the presence of aluminum chloride" to create F-pentene-2, a replacement for the coolant, Freon 113. Id. at 684. PCR was aware that TFE is an extremely dangerous chemical, for "ICI, the company that manufactures TFE, notified PCR in April 1991, that it was planning to discontinue supplying TFE throughout the United States because of its hazardous character." Id. at 685. "TFE's explosive force is equal to two-thirds that of TNT, and the risk of an explosion by using TFE in the production of F-pentene-2 is very high." Id. at 684-85 (emphasis added). The risk was so high, in fact, that there was "evidence of `at least three' other uncontrolled explosions at PCR in just under two years." Id. at 685.[20]
Since similar uncontrolled explosions had occurred at PCR on at least three different occasions and since TFE was known to be a dangerous and explosive chemical, this November 22, 1991, explosion that claimed the life of Paul Turner and seriously injured James Creighton was foreseeable, substantially certain to occur, and should have been anticipated. Hence, it is quite clear that this was not an accident. Because this was not an accident, PCR was not covered under Part Two of its Employers Liability Insurance Policy since that policy's "coverage applied only to claims of `bodily injury by accident ... aris[ing] out of and in the course of the injured employee's employment by [PCR]." Majority op. at 784.
For these reasons, I dissent.
WELLS and CANTERO, JJ., concur.
NOTES
[1] The latter method of satisfying the intentional-tort exception has now been modified by the Legislature. See infra note 5.
[2] See Travelers Indem. Co. v. PCR, Inc., 326 F.3d 1190, 1194 (11th Cir.2003). We have jurisdiction under article V, section 3(b)(6), Florida Constitution.
[3] See infra note 7.
[4] The Workers' Compensation Law is codified in chapter 440, Florida Statutes. Section 440.11, the exclusive-remedy provision, provides that the liability of the employer for the benefits prescribed under the Workers' Compensation Law "shall be exclusive and in place of all other liability ... of such employer to... the employee." § 440.11(1), Fla. Stat. (2003).
[5] In 2003, the Legislature codified the intentional-tort exception and, in doing so, modified the standard announced in Turner. See ch.2003-412, § 14, at 3890-91, Laws of Fla. Under the current version of section 440.11, an injured employee can satisfy the intentional tort-exception, and thereby avoid the exclusive-remedy provision of section 440.11(1), only by proving by clear and convincing evidence that his employer "deliberately intended to injure him" or that his employer

engaged in conduct that the employer knew, based on prior similar accidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee, and the employee was not aware of the risk because the danger was not apparent and the employer deliberately concealed or misrepresented the danger so as to prevent the employee from exercising informed judgment about whether to perform the work.
§ 440.11(1)(b)(2), Fla. Stat. (2003).
This newly enacted, virtual-certainty standard is similar to the standard adopted by the New Jersey Supreme Court in Millison v. E.I. duPont de Nemours & Co., 101 N.J. 161, 501 A.2d 505 (1985). In Turner, we considered the deliberate-intent standard and the objectively-substantially-certain standard to be "alternative bases" for satisfying the intentional-tort exception. 754 So.2d at 687; see also id. at 688 (adopting an objective approach to the substantial-certainty test because under a subjective approach "there would actually be no alternative basis for recovery against an employer"); id. at 689 ("Because it is apparent that adoption of a subjective analysis would result in the virtual elimination of the alternative test for liability set out in Fisher, we conclude that adoption of an objective standard is more in accord with the policy of the alternative test we adopted in Fisher.") (footnote omitted). In Millison, on the other hand, the New Jersey Supreme Court adopted a much stricter test, 501 A.2d at 514 ("We must demand a virtual certainty."), which it perceived "not so much as a substantive test itself nor as a substitute for a subjective desire to injure, [but instead] as a specie of evidence that will satisfy the requirement ... that `deliberate intention' be shown." Id. We must keep in mind, when determining whether the claims brought against PCR in this case are covered by the employer's liability policy at issue here, that those claims are being brought not under the newly enacted virtual-certainty standard but under the much more liberal standard announced in Turner.
The strictness of the Millison standard (and its similarity to Florida's newly enacted, virtual-certainty standard) was revealed not only by the New Jersey Supreme Court's articulation, but also by its application of the standard. Millison held that the employees' claim that their employer knowingly allowed them to be exposed to asbestos and concealed from them the known dangers of such exposure "c[a]me up short of the `substantial certainty' needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute." 501 A.2d at 514-15. By contrast, the court held that the employees' second claim did meet the standard. That claim alleged that the employer (through workplace physical examinations performed by company doctors) learned that the employees were suffering from asbestos-related diseases and fraudulently concealed this fact from the employees. Id. at 516 ("These allegations go well beyond failing to warn of potentially-dangerous conditions or intentionally exposing workers to the risks of disease. There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace.... Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act.").
[6] At this point there has not yet been a finding that "the explosion in the instant case was foreseeable and should have been anticipated," dissenting opinion at 799 (Quince, J.), nor that the explosion "was foreseeable, substantially certain to occur, and should have been anticipated." Id. at 800. Our decision in Turner simply held that Turner and Creighton had presented sufficient evidence to preclude an entry of summary judgment on PCR's exclusive-remedy defense. The plaintiffs will still have to prove these points at trial. This point is not critical to our holding, nor to the dissent's conclusion  the issue here is one of law: whether a Turner claim, if proven, necessarily falls outside the coverage scope of this employer's liability policy  but for the sake of accuracy it is important to make this clear.
[7] The circumstances under which PCR could become obligated to pay damages (other than the statutorily mandated workers' compensation benefits) to injured employees will, of course, be limited. In most cases, the benefits provided under the Workers' Compensation Law will be the injured employee's exclusive remedy. Courts and commentators have noted, however, that, as here, a workers' compensation insurance policy often is issued together with an employer's liability insurance policy, with the latter "intended to serve as a `gap-filler,' providing protection to the employer in those situations where the employee has a right to bring a tort action despite the provisions of the workers' compensation statute." Producers Dairy Delivery Co. v. Sentry Ins. Co., 41 Cal.3d 903, 226 Cal.Rptr. 558, 718 P.2d 920, 927 (1986); see also Ottumwa Hous. Auth. v. State Farm Fire & Cas. Co., 495 N.W.2d 723, 728-29 (Iowa 1993) (quoting 7B John Alan Appleman, Insurance Law and Practice § 4571, at 2 (Walter F. Berdal ed. 1979)).

The dissenting opinions, however, do not account for this. PCR recognized that, despite the provisions of the Workers' Compensation Law, a risk still remained that it could be held liable in tort for damages to its injured employees. To address this risk, PCR purchased the employer's liability insurance policy. The dissenting opinions, however, would largely (though not completely) nullify the effect of the policy. Rather than construing the employer's liability policy as a "gap filler" for situations where the Workers' Compensation Law's usual exclusive-remedy rule does not apply, the dissenting opinions conclude, completely to the contrary, that because the Workers' Compensation Law does not bar the underlying tort suits, the employer's liability policy does not apply.
[8] Contrast with Humana Worker's Compensation Services v. Home Emergency Services, 842 So.2d 778 (Fla.2003), where we held that a claim of negligent spoliation of evidence "plainly" did not constitute a claim for "bodily injury by accident" because the "accident" was the spoliation of evidence  an accident that did not result in bodily injury. The issue in this case easily is distinguishable from the issue in Humana. In Humana, we were interpreting the "bodily injury" portion of the coverage clause. It was clear and unambiguous that a claim of negligent loss of evidence, which resulted in the employee being unable to pursue a claim against a third party, was not a claim for "bodily injury by accident." Here, on the other hand, we must construe the "by accident" portion of the coverage clause. There is no question that the underlying tort suits present claims of "bodily injury"; the question is whether the bodily injury, which allegedly was caused by employer conduct that was objectively substantially certain (although not actually intended) to result in injury, was or was not "bodily injury by accident." This cannot be answered simply by looking to the language of the policy and applying its plain meaning, and neither party's argument suggests such an approach. Travelers argues, and the dissenting opinions conclude, that we should interpret the phrase "by accident" in the same way that we interpreted that phrase in the workers' compensation context. PCR argues, and we agree, that we should interpret the phrase more narrowly, in accordance with settled principles of insurance policy interpretation.
[9] This is not to say that we must interpret the insurance policy in a vacuum. This is a workers' compensation and employer's liability insurance policy, protecting an employer against the risk of both workers' compensation liability and tort liability, and, since it is such a policy, it would make little sense not to interpret it with reference to the circumstances under which the parties entered into the contractual agreement. See supra at 784 note 7. But interpreting the policy language (particularly when that language, on its face, is ambiguous) with reference to the reasons which motivated the parties to make the contract is not the same as interpreting terms in the policy language identically to the way those terms have been interpreted in different contexts. This is especially so where, as here, such interpretations would actually undermine what was most likely the parties' intent in making the contract.
[10] Numerous courts have recognized this principle: that there is not, as Justice Wells contends, "an unreasonable, irreconcilable inconsistency," see dissenting opinion at 797, in reaching differing conclusions as to whether an injury was "accidental" for workers' compensation purposes and whether it was "accidental" for liability insurance purposes. See, e.g., Royal Indem. Co. v. Soneco/Northeastern, Inc., 183 F.Supp.2d 526, 531 (D.Conn.2002) ("[T]he critical inquiry is not whether the allegations against the employer will withstand scrutiny under [Connecticut's version of Turner] so as to avoid the workers' compensation bar, but rather whether the allegations fall within the language of the policy's exclusion."); Ott v. LPK Systems, Inc., 812 So.2d 38, 42 (La.Ct.App.2001) ("[T]he inquiry into whether injuries are `intended or expected' by an insured under the terms of an insurance contract differs from the inquiry into whether an act is `intentional' under the worker's compensation statute's intentional acts exception to a co-employee's tort immunity."); Cavalier Mfg. Co. v. Employers Ins. of Wausau, 222 Mich.App. 89, 564 N.W.2d 68, 70-71 (1997) ("[W]e must determine not whether an employee's allegations successfully avoid the exclusive remedy provision of [Michigan's Worker's Disability Compensation Act (WDCA)]... but whether those allegations are comprehended by a particular insurance policy.... The [Michigan] Supreme Court's interpretation of statutory language contained in the WDCA has no bearing on the language contained in [the] insurance policy."). But see Travelers Ins. Co. v. Noble Oil Servs., Inc., 42 F.3d 1386 (4th Cir.1994) (unpublished opinion) ("Determining whether Matthews' complaint alleges that Noble intentionally caused his injuries requires a brief review of the workers' compensation laws of North Carolina.... `[I]n order to allege a cause of action under Woodson[ v. Rowland, 329 N.C. 330, 407 S.E.2d 222 (1991) (North Carolina's version of Turner)] and circumvent the workers' compensation law the plaintiff must necessarily allege that the injury as well as the act was intentional.' Because the Matthews state court complaint effectively alleges that Noble intended Matthews' injuries, the Matthews action falls squarely within the scope of the intentional injury exclusion." (citation omitted)).
[11] One prominent criticism of the adoption of a substantial-certainty standard is the fact that such a standard relies on principles of tort law to interpret a provision of the workers' compensation law. See, e.g., 2 Arthur Larson, Larson's Workers' Compensation, § 103.03 (desk ed.2004) (criticizing use of tort-based, substantial-certainty tests because "[e]xclusiveness is a compensation law question, not a tort law question") (emphasis added); id. § 103.04[4] ("[T]he efforts to stretch the concept of intentional injury are not undertaken in the name of discovering a truer and higher meaning of `intentional'; they are undertaken because these courts still cannot quite accept the non-fault nature of workers' compensation and have taken it upon themselves to change the statutory scheme to conform more closely to their values.").
[12] It certainly cannot be said that such a construction flows from the plain meaning of the policy's language. See, e.g., Webster's Third New International Dictionary 11 (1981) (defining "accident" as, among other things, "an event or condition occurring by chance or arising from unknown or remote causes"; "lack of intention or necessity: chance  often opposed to design"; "an unforeseen unplanned event or condition"; "a ... sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result"); id. (listing one definition of "accidental" as "happening or ensuing without design, intent, or obvious motivation or through inattention or carelessness"); see also 2 Arthur Larson, Larson's Workers' Compensation, § 103.03 (desk ed.2004) (discussing proper interpretation of workers' compensation laws and "the narrow issue of the intentional versus accidental quality of the precise event producing injury": "The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm comparable to an intentional left jab to the chin.").
[13] In any event, despite our statements to the contrary in CTC Development, it is not clear why the definition of "accident" employed there should apply here. The policy at issue there included an exclusionary clause materially different than the exclusionary clause in the present policy. The policy in CTC Development included a clause that excluded from coverage "property damage ... expected or intended from the standpoint of the insured." 720 So.2d at 1073 (emphasis omitted). In defining the term "accident" in the coverage clause, we looked to the scope of the exclusionary clause on the ground that all "pertinent provisions [of the policy] should be read in pari materia." Id. at 1075 (quoting Nationwide Mut. Fire Ins. Co. v. Olah, 662 So.2d 980, 982 (Fla. 2d DCA 1995)); see also 2 Eric Mills Holmes, Holmes's Appleman on Insurance, § 5.3, at 64-64 (2d ed.1998). Applying this principle of insurance policy interpretation, we concluded that "[r]eading the coverage provision of the policy together with the exclusionary clause could support a conclusion that coverage is provided in the ... policy for occurrences where the insured did not intend or expect to cause harm to the third party." Id. If we were to apply the same principle here in interpreting the present policy, which contains a more narrowly drawn exclusionary clause (excluding from coverage "bodily injury intentionally caused ... by [PCR]" as opposed to excluding injuries intended or expected by PCR), our definition of the term "accident" in the coverage clause probably would be correspondingly more broad. Determining whether this is so requires us to address the second point of contention between the parties: the proper interpretation of the exclusionary clause.
[14] See supra note 5.
[15] The fact that such conduct is sufficient to impute intent under principles of tort law or compensation law does not alter this conclusion. The question is whether such conduct is sufficient to impute intent for purposes of invoking an insurance policy's injury-intentionally-caused exclusionary clause. See supra note 10.
[16] The difference between the objectively-substantially-certain standard adopted in Turner and the Legislature's newly enacted, virtual-certainty standard is critical. See supra note 5. In New Jersey Manufacturers Insurance Co. v. Joseph Oat Corp., 287 N.J.Super. 190, 670 A.2d 1071 (App.Div.1995), the court held that a claim brought under New Jersey's Millison standard, which is similar to the Legislature's newly enacted standard, was excluded from coverage under the employer's liability policy's injury-intentionally-caused exclusion. Unlike Turner, where we held that the objectively-substantially-certain standard created an "alternative bas[i]s" for satisfying the intentional-tort exception, 754 So.2d at 687, the Millison standard did not constitute an alternative to actual intent. Joseph Oat Corp., 670 A.2d at 1073 ("[W]e think it plain that only one type of intent is sufficient to escape the exclusivity of the Workers' Compensation Act and reject the contention that the [New Jersey] Supreme Court adopted something less as an alternative viable cause of action."); see also id. at 1074 ("There are not ... two discrete categories of conduct which will satisfy the requirement of an `intentional wrong' to escape the exclusivity of workers' compensation remedies. Both subjective intent and substantial certainty of harm are expressive of the same standard, i.e., deliberate intent to harm.").
[17] In Eller v. Shova, 630 So.2d 537 (Fla.1993), we defined "culpable negligence" as "reckless indifference" or "grossly careless disregard" of human life; we defined "gross negligence," on the other hand, as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." Turner, 754 So.2d at 687 n. 3 (quoting Eller, 630 So.2d at 541 n. 3).
[18] Insurers, of course, remain free to craft policies explicitly limiting the scope of a "by accident" coverage clause or broadening the scope of an "intentional injury" exclusionary clause. Our task here was simply to interpret the scope of those particular clauses in a policy that left the operative terms undefined.
[19] The Eleventh Circuit specifically stated: "The certified questions we seek to pose to the Florida Supreme Court are intended by us in no way to limit the scope of that high court's review." Travelers Indemnity Co. v. PCR Inc., 326 F.3d 1190, 1194 (11th Cir.2003).
[20] The three explosions occurred on October 27, 1988, August 3, 1989, and July 20, 1990. Turner, 754 So.2d at 685.